UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MINDY JAYE ZIED-CAMPBELL, | : CIVIL NO: 1:CV-04-00026 |
| Plaintiff | : |
| | : (Judge Kane) |
| v. | : |
| | : (Magistrate Judge Blewitt) |
| ESTELLE RICHMAN, Secretary | : |
| Pennsylvania Dept. of Public | : |
| Welfare; FREDERICK LANDAU, | : |
| Director the York County | : |
| Assistance Office; DOES 1-25; | : |
| and STEPHANIE LUDWIG, Supervisor | : |
| York County Assistance Office, | : |
| Defendants | : |

## REPORT AND RECOMMENDATION

### I. Background and Procedural History.

The plaintiff commenced this action, pro se, by filing a complaint on January 7, 2004. (Doc. 1).

By an Order dated January 23, 2004, the plaintiff's motion for the appointment of counsel was granted conditioned on the *Pro Bono* Coordinator with the Federal Bar Association finding an attorney willing to enter an appearance on behalf of the plaintiff in this case. On June 11, 2004, Jason E. Oyler, Esquire entered his appearance on behalf of the plaintiff. Andrew C. Clark, Esquire subsequently became co-counsel for the plaintiff.

On September 13, 2004, the plaintiff filed an amended complaint.

The amended complaint names as defendants Estelle Richman, the Secretary of the Pennsylvania Department of Public Welfare; Frederick Landau, the Director of the York County Assistance Office; Stephanie Ludwig, a Supervisor for the York County Assistance Office; and Does 1 through 25, identified as employees of the York County Assistance Office.

The plaintiff alleges that she has a permanent psychological disability and that she has been diagnosed as having schizoaffective disorder, paranoid disorder, and bipolar disorder. *Amended Complaint* at ¶10. She alleges that her disability has substantially limited her ability to perform major life activities. *Id.* at ¶12.

The plaintiff alleges that she moved from California to Pennsylvania with her twelve-year-old daughter. *Id.* at ¶8. She alleges that her husband stayed in California with her other two children, ages 17 and 19, so that the one child could finish 12th grade and the other child could begin college. *Id.* at ¶9.

The plaintiff alleges that in September of 2001, she applied for and was granted supplemental security income benefits (SSI) from the Social Security Administration. *Id.* at ¶13. She subsequently applied to the York County Assistance Office for Cash Aid, Food Stamps and Medicaid. *Id.* at ¶14.

The plaintiff alleges that, although the York County Assistance Office was aware that she was a SSI recipient which made her eligible for the three programs it offered, it still subjected her to an additional in person interview in violation of regulations. *Id.* at ¶15. She alleges that she

was approved for food stamps and Medicaid. *Id.* at ¶18.  However, she alleges that in a distressing

interview with a caseworker for the York County Assistance Office she was coerced into withdrawing

her application for cash aid. *Id.* at ¶16.  She alleges that the caseworker told her that it was

mandatory that she file charges against her husband for child support. *Id.*  She alleges that she

believed that she had good cause not to file charges against her husband for child support since she

was separated from her husband only by state and not by marriage. *Id.*  She alleges that she was not

given an opportunity to present her good cause to an administrative law judge in a fair hearing

proceeding. *Id.* at ¶17.  She alleges that she discovered at a later date that a fair hearing proceeding

would have been an applicable remedy for the deprivation of her right to collect a subsidy that she

believed was available. *Id.*  She alleges that the York County Assistance Office refused to address her

request for retroactive benefits. *Id.*

The plaintiff's husband subsequently moved from California to Pennsylvania and the

plaintiff notified the York County Assistance Office and added her husband as a member of her

household. *Id.* at ¶19.  She alleges that her other two children remained in California and as result

her household was deemed to go from a five member household to a three member household

even though her other two children were still dependents of her and her husband. *Id.* at ¶20.  The

plaintiff alleges that prior to the time that her husband moved to Pennsylvania, both she and her

husband were on individual disability status. *Id.* at ¶21.  She alleges that the Social Security

Administration stated that it was in the process of changing their status for SSI purposes to that a

disabled couple. *Id.* at ¶21.  The plaintiff alleges that the York County Assistance Office withheld

important documentation when it made notes regarding the Social Security Administration's process of changing the plaintiff and her husband's status. *Id.* at ¶22.  She alleges that after adding her husband's social security disability disbursement and his veteran's non-service connected benefits, the York County Assistance Office terminated their benefits. *Id.*  The plaintiff alleges that an appeal before an administrative law judge was for the most part in favor of her household. *Id.* at ¶23.

The plaintiff alleges that due to the York County Assistance Office's insensitivity to persons with mental disabilities and its neglect in not putting a correct code in the computer her family was subject to paying the state's portion of their medical insurance for many months. *Id.* at ¶24.

The plaintiff alleges that on September 17, 2003, she sent correspondence to the director of the York County Assistance Office. *Id.* at ¶25.  She alleges that she reiterated her psychological disability and pointed out that defendant Ludwig had threatened to close her case if she did not fill out a particular form. *Id.*  She alleges that she indicated that she was upset and that she requested an accommodation that everything be put into writing from that point on. *Id.* at ¶26. The plaintiff alleges that the York County Assistance Office failed to accommodate her request. *Id.*

The plaintiff alleges that she contacted a mental health organization for assistance. *Id.* at ¶27.  She alleges that an advocate of the organization contacted the York County Assistance Office and requested that the plaintiff not be required to appear for an in person interview due to her disabling condition. *Id.*  The plaintiff alleges that defendant Ludwig refused to accommodate the plaintiff's request for a telephone interview in lieu of an in person interview. *Id.* at ¶¶27-28.  The

4

plaintiff alleges that the regulations of the York County Assistance Office permit telephone interviews

for individuals due to hardship and/or disabilities and that in failing to allow a telephone interview

the York County Assistance Office violated its own regulations as well as Title II of the Americans

with Disabilities Act. *Id.* at ¶28.

The plaintiff alleges that she had good cause for not completing a semi-annual

reporting form, that the York County Assistance Office ignored her response showing that she had

good cause for not signing the form, and that defendant Ludwig deprived her of a good cause

hearing concerning the matter. *Id.* at ¶29.   The plaintiff alleges that defendant Ludwig telephoned

her and stated that she was sending an additional form. *Id.* at ¶30.  She alleges that defendant

Ludwig ignored her statements  that she was exempt from filing out the form based on regulations

that provide that when all adult members of a household are disabled and have no earned income

they are exempt from monthly and semi-annual reporting requirements. *Id.*

The plaintiff alleges that, based on the fact that her SSI payments had stopped,

defendant Ludwig continued to deny that the plaintiff was disabled even though the York County

Assistance Office knew that the plaintiff's SSI payments had ceased not because she was not

disabled but because her husband's disability pension from the Veteran's Administration and social

security disability income benefits increased.  *Id.* at ¶32.  The plaintiff alleges that, even after she

submitted documentation from the Social Security Administration stating that she was entitled to

monthly payments as a disabled spouse and after she made numerous complaints through the

Department of Public Welfare's hotline number, the York County Assistance Office continued to use

a code identifying her as a non-disabled person. *Id.* at 33.   The plaintiff alleges that after the York County Assistance Office received her household bills the discount that she had been receiving on her electric bill was revised and the amount of her bill increased by almost sixty percent. *Id.* at ¶34.

The plaintiff alleges that she was deprived of a fair hearing scheduled for October 30, 2003 when the York County Assistance Office informed the administrative law judge that "they had come to a settlement." *Id.* at ¶35.   The plaintiff alleges that on October 28, 2003, the York County Assistance Office drew up paperwork indicating that food stamps and Medicaid for the plaintiff's household were being discontinued and which included incorrect calculations. *Id.*   The plaintiff alleges that she informed the York County Assistance Office that its calculation of her family's income was incorrect and that she complained about not being permitted to submit proof. *Id.* at ¶36.

The plaintiff alleges that the York County Assistance Office and its employees managed to get someone from the Veterans Administration to submit misinformation concerning the calculation of the plaintiff's VA benefits so that they could terminate the plaintiff's household from their program. *Id.* at ¶37.   The plaintiff alleges that defendant Ludwig has harassed her with phone calls and that the York County Assistance Office has continued to harass, coerce, intimidate and threaten her with respect to her rightful subsidies. *Id.* at ¶¶38-40.   She alleges that the York County Assistance Office and its employees have  held her to more stringent criteria than applied to other persons applying for benefits. *Id.* at ¶41.   The plaintiff alleges that the York County Assistance Office and its employees have improperly disseminated false information regarding her

household internally, to the Department of Public Welfare, and to outside sources such as the Social Security Administration. *Id.* at ¶42.

       The plaintiff alleges that the Department of Public Welfare refused to investigate her allegations regarding the discriminatory manner in which she was being treated by the York County Assistance Office. *Id.* at ¶43.  She alleges that the Department of Public Welfare refused to assist her in her attempts to determine the calculations used to determine her benefits and that, despite the problems she reported about the York County Assistance Office, the Department of Public Welfare forced her to go back to the York County Assistance Office for assistance. *Id.* at ¶44.

       The plaintiff alleges that due to the misconduct of the York County Assistance Office and its employees, the Pennsylvania Department of Public Welfare, and defendant Ludwig, she has sustained irreparable injuries aside from and in conjunction with her disability. *Id.* at ¶47.  She alleges that she is unable to sleep properly, that she has disturbing dreams, that she suffers from anxiety, hysteria, excessive eating, disaccord in her marriage, increased irritability, increased paranoia, communicative problems with her daughter, accelerated mood swings and stress headaches. *Id.* at ¶¶48-49.

       The plaintiff alleges that every time she has complained about defendant Ludwig, defendant Ludwig has retaliated against her by telephoning her at inopportune moments. *Id.* at ¶50.  She alleges, for example, that on December 31, 2003, at 12:00 p.m. defendant Ludwig telephoned and stated that she was cutting off the Medicaid for the plaintiff's household knowing that the plaintiff would be unable to contact anyone until after the holiday. *Id.*  She alleges that the York

County Assistance Office would send mail to her so that she would receive the mail on a Saturday and would be unable to contact anyone regarding that piece of mail until Monday. *Id.* at ¶51.  She alleges that the York County Assistance Office and its employees have insinuated that she is a liar and fraudulent. *Id.* at ¶52.  She alleges that the York County Assistance Office has withheld paperwork it received from other agencies from her without giving her an opportunity to dispute or investigate whether the information on the paperwork was correct. *Id.* at ¶53.

The plaintiff alleges that the Pennsylvania Department of Public Welfare, the York County Assistance Office and its employees, including defendant Ludwig, have discriminated against her because of her disability, have created unnecessary eligibility standards and rules that have denied her access to and the enjoyment of the services and programs offered due to her disability, have refused her reasonable requests for accommodation of her disability, have violated regulations requiring them to take steps necessary to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others, and have retaliated against her because she asserted her rights and complained about the manner in which she has been treated. *Id.* at ¶¶56-64.

The amended complaint contains three counts.  Count I is a claim under Section 504 of the Rehabilitation Act.  Count II is a claim under Title II of Americans with Disabilities Act.  Count III contains claims of retaliation under both the Rehabilitation Act and the Americans with Disabilities Act.  As relief, the plaintiff requests monetary damages and injunctive relief in the form of an order prohibiting defendant Ludwig and caseworker Patricia Wiles from any future contact

with her or her case.   The plaintiff also requests costs and attorneys' fees and such other relief as the court deems just and appropriate.

On September 22, 2004, the defendants filed an answer to the amended complaint.

On November 19, 2004, the State official defendants, Estelle Richman, Frederick Landau and Stephanie Ludwig, filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) as well as a support brief. (Docs. 28 & 29).

On January 31, 2005, Jason E. Oyler, Esquire withdrew his appearance on behalf of the plaintiff.

On March 21, 2005, Andrew C. Clark, Esquire, filed a motion to withdraw his appearance on behalf of the plaintiff.   By an Order dated March 22, 2005, the court granted the motion of Attorney Clark to withdraw his appearance.

On April 1, 2005, the plaintiff filed a motion seeking reconsideration of the Order of March 22, 2005 and requesting that the court hold this case in abeyance until new counsel enters an appearance on her behalf.

By an Order dated April 11, 2005, Judge Kane stayed this case pending the plaintiff's attempts to obtain counsel.   On September 28, 2005, James J. West, Esquire, entered his appearance on behalf of the plaintiff.  By an Order dated October 5, 2005, Judge Kane lifted the stay and established new case management deadlines.

This Report and Recommendation addresses the defendants' motion for judgment on the pleadings, which motion has been fully briefed.  (Docs. 29, 32 & 33).

## II. Motion for Judgment on the Pleadings Standards.

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed but within such time as not to delay the trial."   In deciding a motion for judgment on the pleadings the court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the . . . nonmoving party." *Green v. Fund Asset Management*, 245 F.3d 214, 220 (3d Cir. 2001)(quoting *Institute for Scientific Info., Inc. v. Gordon & Breach, Science Publishers, Inc.*, 931 F.2d 1002, 1004 (3d cir. 1991)).   Judgment on the pleadings is only appropriate if the plaintiff would not be entitled to relief under any set of facts that could be proved. *Id.*

## III. Individual Liability under the ADA and Rehabilitation Act.

The defendants contend that they may not be held liable in their individual capacities under Title II of the ADA or Section 504 of the Rehabilitation Act.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132 (2003).   As used in Title II of the ADA, "public entity" is defined as: "(A) any State or local government; (B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and (C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act [49 USCS § 24102(4)])."   42 U.S.C. § 12131(a).

The plain language of § 12132 applies only to public entities not individuals. *See Miller v. King*, 384 F.3d 1248, 1277 (11th Cir. 2004)(holding that individuals are not subject to personal liability under § 12132 for violations of Title II of the ADA); *Yeskey v. Commonwealth*, 76 F.Supp.2d 572, 575 (M.D.Pa. 1999)(holding that individuals are not liable under Title II because it prohibits discrimination in programs of a "public entity" or discrimination "by any such entity" and "public entity" is not defined in Title II to include individuals).  Accordingly, it will be recommended that the plaintiff's claims under Title II of the ADA against the defendants in their individual capacities be dismissed.

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a)(1998).  Section 504 applies only to recipients of federal financial assistance. *United States Dep't of Transp. v. Paralyzed Veterans of America,* 477 U.S. 597, 605 (1986)("Congress limited the scope of § 504 to those who actually "receive" federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds.").  The plaintiff has not alleged and there is no basis to reasonably infer that the individual defendants receive federal financial assistance.  Therefore, the plaintiff does not state a claim against the defendants in their individual capacities under § 504 of the Rehabilitation Act. *Emerson v. Thiel College*, 296 F.3d

184, 190 (3d Cir. 2002)("Because the individual defendants do not receive federal aid, Emerson does not state a claim against them under the Rehabilitation Act.").

The plaintiff does not dispute that generally officials may not be held liable in their individual capacities under Title II of the ADA or Section 504 of the Rehabilitation Act.  However, the plaintiff argues that defendants Ludwig and Landau[1] can be liable in their individual capacities for retaliation under the ADA and the Rehabilitation Act.

Title IV of the ADA contains an anti-retaliation provision which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Use of the term "person" in the anti-retaliation provision of the ADA is an indication that Congress intended to provide individual liability under § 12203(a).  In regulations implementing the ADA, the Department of Justice (DOJ) has determined that the anti-retaliation provision of the ADA applies to individuals.  28 C.F.R. § 35.134 provides that "[n]o private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part." The DOJ explains this regulation:

---

[1]  The plaintiff states that she is not suing defendant Richman in her individual capacity.

> Section 35.134 implements section 503 of the ADA, which prohibits retaliation against any individual who exercises his or her rights under the Act.... [T]he section applies not only to public entities subject to this part, but also to persons acting in an individual capacity or to private entities. For example, it would be a violation of the Act and this part for a private individual to harass or intimidate an individual with a disability in an effort to prevent that individual from attending a concert in a State-owned park.

28 C.F.R. Part 35, App. A., "Preamble to Regulation on Nondiscrimination on the Basis of Disability in State and Local Government Services" at 550.  Given Congress' use of the term "person" in § 12203(a) and 28 C.F.R. §35.134, we conclude that defendants Ludwig and Landau be may liable in their personal capacities for a violation of § 12203. *See Shotz v. City of Plantation,* 344 F.3d 1161, 1179-80 (11th Cir. 2003)(deferring to DOJ regulation and holding that an individual may be sued in his or her personal capacity for violating § 12203 in the public services context).

Unlike the ADA, the Rehabilitation Act does not have a separate section prohibiting retaliation.  As indicated above,  Section 504 of the Rehabilitation Act applies only to recipients of federal financial assistance and the plaintiff has not alleged that the defendants receive federal financial assistance.  Accordingly, we conclude that the defendants may not be liable in their individual capacities for retaliation under the Rehabilitation Act.

In sum, we conclude that the defendants may not be held liable in their individual capacities for claims under Title II of the ADA and for claims under the Rehabilitation Act, but that defendants Ludwig and Landau may be held personally liable for a violation of 42 U.S.C § 12203 - the anti-retaliation provision of the ADA.

**IV.  Eleventh Amendment Immunity from Claims for Damages Against the Defendants in their Official Capacities under Title II of the ADA.**

The defendants contend that the Eleventh Amendment bars the plaintiff's claims against them in their official capacities for damages under Title II of the ADA.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Although its text appears to restrict only the Article III diversity jurisdiction of the federal courts, the Eleventh Amendment has been interpreted "to stand not so much for what it says, but for the presupposition . . . which it confirms." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)(quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991)).   That presupposition is that each state is a sovereign entity in our federal system and that it is inherent in the nature of sovereignty that a sovereign is not amenable to suit unless it consents. *Id*.  Thus, "the Constitution does not provide for federal jurisdiction over suits against nonconsenting States." *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000).

Congress, however, may abrogate States' Eleventh Amendment immunity when it unequivocally intends to do so and it acts pursuant to a valid grant of constitutional authority. *Id.* at 73.  To determine whether Congress has abrogated the states' Eleventh Amendment immunity we must resolve two questions: "first, whether Congress unequivocally expressed its intent to abrogate

that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." *Id.*

Congress unequivocally expressed in the ADA its intent to abrogate the States' Eleventh Amendment immunity.  *See* 42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this Act.").  Thus, we must determine whether in extending the provisions of Title II of the ADA to the States Congress acted pursuant to a valid grant of constitutional authority.

The defendants contend that Congress exceeded its constitutional authority in attempting to abrogate the States' Eleventh Amendment immunity for claims, such as the claims in this case, under Title II of the ADA relating to access to state welfare benefits and services.[2]

Congress indicated that it enacted the ADA pursuant to its power to enforce the Fourteenth Amendment and pursuant to it power to regulate commerce. 42 U.S.C. § 12101(b)(4). However, the Supreme Court has held that Congress may not abrogate the States' Eleventh Amendment immunity from suits for damages based on its Article I commerce power. *Kimel*, *supra*, 528 U.S. at 78-79.  Thus, the question is whether Congress validly exercised its remedial powers

---

[2]  Pursuant to 28 U.S.C. § 2403(a) we certified to the Attorney General that the constitutionality of 42 U.S.C. § 12202 as applied to the claims in this case had been called into question and we gave the United States an opportunity to intervene in this action. (Doc. 40). The United States has not intervened in this action.

under § 5 of the Fourteenth Amendment in its purported abrogation of the States' Eleventh

Amendment immunity under Title II of the ADA.

> The Fourteenth Amendment provides, in pertinent part:
>
> Section 1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
> . . .
> Section 5.  The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

Section 5 is an affirmative grant of power to Congress.  *City of Boerne v. Flores*, 521

U.S. 507, 517 (1997).  "It is for Congress in the first instance to 'determine whether and what

legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions

are entitled to much deference." *Id.* at 536 (quoting *Katzenbach v. Morgan*, 384 U.S. 641, 651

(1966)).  "Congress' power "to enforce" the Amendment includes the authority both to remedy and

to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of

conduct, including that which is not itself forbidden by the Amendment's text." *Kimel, supra,* 528

U.S. at 81.  However, Congress' enforcement power under § 5 of the Fourteenth Amendment is not

unlimited. *City of Boerne*, *supra,* 521 U.S. at 518.  Congress can enforce the provisions of the

Fourteenth Amendment but Congress can not determine or change what constitutes a constitutional

violation. *Id.* at 519.  "While the line between measures that remedy or prevent unconstitutional

actions and measures that make a substantive change in the governing law is not easy to discern, and

16

Congress must have wide latitude in determining where it lies, the distinction exists and must be observed." *Id*. at 519-20. "There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id*. at 520. Without such a connection, "legislation may become substantive in operation and effect." *Id*.

The Supreme Court has developed a three-part "congruence and proportionality" test for use in determining whether Congress has acted within the scope of its § 5 power to abrogate States' sovereign immunity. *Miller v. King*, 384 F.3d 1248, 1269 (11th Cir. 2004). A court must: (1) identify with some precision the scope of the constitutional right at issue, (2) determine whether Congress identified a history and pattern of unconstitutional conduct by the States, and (3) if so, analyze whether the statute is an appropriate, congruent, and proportional response to that history and pattern of unconstitutional treatment. *Id*.

The Supreme Court has twice analyzed whether Congress validly abrogated the States' Eleventh Amendment immunity under the ADA.

In *Board of Trustees of the Univ. of Alabama v. Garrett*, 531 U.S. 356 (2001), the Supreme Court held the Congress did not validly abrogate States' Eleventh Amendment immunity from suits for monetary damages under Title I of the ADA, which relates to employment discrimination.

Under the first prong of the congruence and proportionality analysis, the Court in *Garrett* identified the Equal Protection Clause as the constitutional right at issue. Based on its decision in *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985), in which it determined

that mental retardation was not a quasi-suspect classification under its equal protection jurisprudence and that, therefore, legislation affecting the mentally retarded is subject only to rational basis review, the Court indicated that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals are rational." *Id.* at 366-67.  The Court continued that "[i]f special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection Clause." *Id.* at 368 (footnote omitted).

Under the second prong of the congruence and proportionality analysis, the Court in *Garrett* examined whether Congress had identified a history and pattern of unconstitutional employment discrimination by the States against the disabled. *Id.* at 368.  The Court concluded that the legislative record of the ADA failed to identify a pattern of irrational state discrimination in employment against the disabled. *Id.*   The Court stated that the majority of the evidence before Congress relating to disability discrimination related to the provision of public services and public accommodations rather than to employment discrimination. *Id.* at 371 n.7.

Under the third prong of the congruence and proportionality analysis, the Court in *Garrett* determined that the duty to accommodate disabled individuals under Title I of the ADA far exceeds what is constitutionally required under the Equal Protection Clause. *Id.* at 372.  The Court concluded that to uphold Title I's application to the States would allow Congress to rewrite the Fourteenth Amendment law laid down by the Court in *Cleburne* and that Section 5 of the Fourteenth Amendment does not provide Congress with that authority. *Id.* at 374.

In *Tennessee v. Lane*, 541 U.S. 509 (2004), the Supreme Court again considered whether Congress validly abrogated the Eleventh Amendment in the ADA.  In Lane, the Court examined Title II of the ADA in the context of access by disabled persons to the courts.

Applying the first step of the congruence and proportionality analysis, the Supreme Court in *Lane* indicated that Title II seeks to enforce a variety of basic constitutional guarantees such as rights protected by the Due Process Clause of the Fourteenth Amendment, including the right of access to the courts, as well as the Equal Protection Clause's prohibition on irrational disability discrimination. *Id.* at 522-23.

In the second step of the congruence and proportionality analysis, the Supreme Court in *Lane* addressed the history and pattern of violations of constitutional rights of the disabled by the States. *Id.* at 523.  The Court stated that while § 5 of the Fourteenth Amendment authorizes Congress to enact reasonably prophylactic remedial legislation, "the appropriateness of the remedy depends on the gravity of the harm it seeks to prevent." *Id.*  The Court further indicated that while difficult and intractable problems often require powerful remedies, measures appropriate to address one harm may be an unwarranted response to another, lesser harm. *Id.* at 524.

The Court in *Lane* determined that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." *Id.*  It mentioned deprivations in the areas of voting, marrying, serving as jurors, unjustified commitment, abuse and neglect in mental health hospitals, and irrational discrimination in zoning decisions. *Id.* at 524-25.  The Court then indicated that

decisions of the courts "document a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting" and a "pattern of unconstitutional treatment in the administration of justice." *Id.* at 525 (footnotes omitted).  The Court concluded that "[t]his pattern of disability discrimination persisted despite several federal and state legislative efforts to address it" and that in the deliberations preceding the ADA's enactment, "Congress identified important shortcomings in existing laws that rendered them 'inadequate to address the pervasive problems of discrimination that people with disabilities are facing.'" *Id.* at 526 (quoting S.Rep.No. 101-116, at 18).  The Supreme Court concluded that Title II was enacted in response to a history and pattern of disability discrimination in the provision of public services and access to public facilities. *Id.* at 529.  The Court determined that Congress' conclusion that discrimination against individuals with disabilities persists in such critical areas as education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services, and the extensive record that underlies that conclusion, makes it clear that the inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation. *Id.*

At the third step of the congruence and proportionality analysis, the Supreme Court in *Lane* declined to decide whether Title II as a whole satisfies the congruence and proportionality requirement. *Id.* at 530-31.  Instead, noting that Title II reaches a wide array of conduct in an effort to enforce an equally wide array of constitutional guarantees, the Supreme Court adopted an as-applied test and considered only whether Congress had the power under § 5 of the Fourteenth

Amendment to subject the States to private suits for monetary damages in the context of access to the courts. *Id.* at 531.

Noting the long history of the States' unequal treatment of disabled persons in the administration of judicial services and the "considerable evidence of the shortcomings of previous legislative responses," the Supreme Court concluded that Congress was justified in enacting the prophylactic measures in Title II for access to judicial services. *Id.* at 531. The Court characterized Title II's remedy in the area of access to courts as "limited" because it requires only reasonable modifications the would not fundamentally alter the nature of the service provided and only when the individual seeking modification is otherwise eligible for the service. *Id.* at 531-32. The Court determined that Title II's duty to accommodate is consistent with the well-established due process principle that, within the limits of practicability, a State must afford all individuals a meaningful opportunity to be heard in its courts and that the duty to accommodate is not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Id.* at 532-33. Therefore, the Court concluded that the duty to accommodate in the context of access to the courts  in Title II of the ADA "is a reasonable prophylactic measure, reasonably targeted to a legitimate end" and that Title II, "as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment." *Id.* at 533-34.

Guided by the analysis in *Garrett* and *Lane* we apply the three part congruence and proportionality analysis in this case.

The first step in the congruence and proportionality analysis is to identify with some precision the scope of the constitutional right at issue. *Miller*, *supra,* 384 F.3d at 1269. As the Court in *Lane* stated, Title II of the ADA seeks to enforce a variety of constitutional guarantees including rights protected by the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.  541 U.S. at 522-23.

The parties agree that this case implicates the Equal Protection Clause of the Fourteenth Amendment.  Since disability is not a suspect or quasi-suspect classification under the Court's equal protection jurisprudence, state action affecting the disabled is subject only to rational basis review. *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985).  The Equal Protection Clause does not require States to make special accommodations for the disabled, so long as their actions toward the disabled are rational. *Garrett, supra,* 531 U.S. at 366-67.

In addition to equal protection, the plaintiff contends that this case implicates the Due Process Clause.  The plaintiff alleges that she was denied fair hearings in connection with the benefits administered by the defendants.  The defendants argue that due process is not implicated in this case because the amended complaint does not contain any allegations that the plaintiff's due process rights were violated.  However, the claim at issue is the plaintiff's Title II ADA claim not a constitutional claim.  Thus, it is not surprising that the plaintiff has not pled that her due process rights were violated.  The question is not whether the plaintiff has pled a due process claim but

whether the Due Process Clause is implicated by the plaintiff's claims under the ADA.  Just as the

Court in *Lane* considered the Due Process Clause in the context of access to the courts because the

ADA claims in that case concerned access to the courts, we will consider the Due Process Clause

in this case in the context of the receipt of welfare benefits.[3]

Although there is no fundamental right to receipt of welfare benefits, *Lavine v. Milne*,

424 U.S. 577, 584 n.9 (1976), once an individual has been determined to be entitled to receive

welfare benefits that entitlement is a property interest protected by the Due Process Clause.

*Goldberg v. Kelly*, 397 U.S. 254, 262-64 (1970)(holding that an individual receiving welfare benefits

has a statutorily created property interest in the continued receipt of those benefits and that due

process requires a hearing before such benefits are terminated). *See also Atkins v. Parker,* 472 U.S.

115, 128 (1985)(stating that food-stamp benefits, like the welfare benefits at issue in *Goldberg,* are

a matter of statutory entitlement for persons qualified to receive them, that such entitlements are

a form of property protected by the Due Process Clause, and that the procedures employed to

determine whether an individual may continue to participate in the statutory program must comply

with the commands of the Constitution).  However, an individual does not have a property interest

protected by the Due Process Clause merely in applying for welfare benefits.   There is a

---

[3]  In a footnote in their reply brief, the defendants also contend that due process is not
implicated in this case because the plaintiff did not have a right to a hearing in the specific
contexts in which she alleges she was denied a hearing.  However, again we note that the
plaintiff's claim is an ADA claim not a due process claim and we are only analyzing due process
in the context of the question whether Congress' purported abrogation of the States' Eleventh
Amendment immunity was based on a valid exercise of its § 5 power to enforce the Fourteenth
Amendment.

constitutionally significant difference between eligibility for a benefit and entitlement to a benefit. *Pappas v. City of Lebanon,* 331 F.Supp.2d 311, 317 (M.D.Pa. 2004)(Conner, J.)(explaining that the difference between eligibility for a benefit and entitlement to a benefit is that eligibility for a benefit means that the person has an ability to seek the benefit whereas entitlement to a benefit means that the person may control the benefit and concluding that only entitlement to a benefit creates a property interest under the Due Process Clause).  Only entitlement to a benefit creates a property interest protected by the Due Process Clause.  *Id.* at 317-18. "Entitlement to a benefit, creating a "property" interest under the Due Process Clause, arises only when government has created an unqualified right to receive the benefit or when the appropriate authority has deemed conditions to receipt satisfied." *Id.* at 318.

The second step in the congruence and proportionality analysis is to determine whether Congress identified a history and pattern of unconstitutional conduct by the States. *Miller, supra,* 384 F.3d at 1269.

The defendants argue that Congress failed to identify a history and pattern of denial of access to welfare benefits to the disabled by the States.  The plaintiff relies on Congress' finding of a history and pattern of discrimination in, among other things, access to public services.  The plaintiff, however, has not pointed to evidence of a pattern of discrimination or denial of due process specifically in connection with the receipt of welfare benefits by the disabled.

The Court in *Lane* concluded that Title II was enacted in response to a history and pattern of disability discrimination in the provision of public services and access to public facilities. 541 U.S. at 529.  The Court in *Lane* determined that Congress' conclusion that discrimination against individuals with disabilities persists in such critical areas as education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services, and the extensive record that underlies that conclusion, makes it clear that the inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation. *Id.* at 529.

"[I]n applying the second step of the *Boerne* test, the Supreme Court in *Lane* considered evidence of disability discrimination in the administration of public services and programs generally, rather than focusing only on discrimination in the context of access to the courts, and concluded that Title II in its entirety satisfies *Boerne*'s step-two requirement that it be enacted in response to a history and pattern of States' constitutional violations." *Miller, supra,* 384 F.3d at 1272.  "We are bound by that conclusion as to step two." *Id.*

The third step in the congruence and proportionality analysis is, if Congress identified a history and pattern of unconstitutional conduct by the States, to analyze whether the statute is an appropriate, congruent, and proportional response to that history and pattern of unconstitutional treatment. *Miller*, *supra,* 384 F.3d at 1269.

At step two of the congruence and proportionality analysis we accepted the Court's conclusion in *Lane* that Title II was enacted in response to a history and pattern of disability

discrimination in the administration of public services and programs generally. However, to give meaning to the Court's context-by-context analytical approach set forth in *Lane,* at step three of the congruence and proportionality analysis we must consider the history of discrimination in the specific context implicated by this case rather than generally. *Id.* at 1272. The specific context implicated by this case is the receipt of welfare benefits. As mentioned above, the plaintiff has not pointed to evidence of a pattern of discrimination or denial of due process specifically in connection with the receipt of welfare benefits by the disabled. Thus, unlike in the context at issue in *Lane,* in the context of receipt of welfare benefits there has not been shown to have been a long history and pattern of unequal treatment of the disabled.

     Moreover, the constitutional rights underlying the Title II ADA claim in this case are more circumscribed than the fundamental right of access to the courts at issue in *Lane.* As discussed above, the rights at issue in this case are the right to be free from irrational disability discrimination under the Equal Protection Clause and the right to due process in connection with the receipt of welfare benefits. The duty to accommodate disabled individuals under Title II of the ADA far exceeds what is constitutionally required under the Equal Protection Clause. *See generally Garrett, supra,* 531 U.S. at 372. Also, the Due Process Clause does not apply to an individual's mere application or request for benefits, but rather the Due Process Clause only protects an individual's entitlement to welfare benefits. However, the duty to accommodate disabled individuals under Title II of the ADA applies to all phases and aspects of an individual's pursuit of welfare benefits.

Because Congress has not identified a history or pattern of constitutional violations against the disabled in the specific context of the receipt of welfare benefits and because the requirements of the States under Title II of the ADA in the welfare context far exceed what is required by either the Equal Protection Clause or the Due Process Clause, we conclude that as applied to the class of cases implicating the receipt of welfare benefits, Title II's affirmative duty to accommodate disabled individuals fails to meet the requirement of proportionality and congruence. Therefore, Title II of the ADA, as applied in this case, does not validly abrogate the Eleventh Amendment immunity of the State. Accordingly, the Eleventh Amendment bars the plaintiff's claims against the defendants in their official capacities for damages under Title II of the ADA.

## V. Claims for Injunctive Relief Against the Defendants in their Official Capacities.

The defendants contend that they are immune from suit under the Eleventh Amendment for claims against them in their official capacities for injunctive relief.

In *Ex Parte Young*, 209 U.S. 123 (1908), "the Court held that a federal court has jurisdiction over a suit against a state officer to enjoin official actions that violate federal law, even if the State itself is immune from suit under the Eleventh Amendment." *Idaho v. Coeur D'Alene Tribe of Idaho*, 521 U.S. 261, 288 (1997)(O'Connor, J., concurring). The *Ex Parte Young* exception to Eleventh Amendment immunity is limited to claims involving prospective relief. *See Edelman v. Jordan*, 415 U.S. 651 (1974).

In her amended complaint, the plaintiff seeks injunctive relief in the form of an order prohibiting defendant Ludwig and caseworker Patricia Wiles from any future contact with her or her

case.  In her amended complaint, the plaintiff also requests such other relief as the court deems just

and appropriate.  In her brief, the plaintiff indicates that she is also seeking injunctive relief requiring

that future correspondence from the defendants be placed in writing, that the defendants cease

disseminating false information regarding her that affects her receipt and eligibility for benefits, that

the defendants cease leaving harassing telephone calls directed at her, and that defendants be

prospectively enjoined from retaliating against her for asserting her rights as they pertain to the ADA,

the Rehabilitation Act and the Public Welfare Code. *Doc. 32* at 14-15.  The plaintiff also indicates

that in order to enjoin the defendants from discriminating against her and others, she is prospectively

seeking the adoption and publication of a grievance procedure pursuant to the requirements of the

ADA. *Id.* at 15.

Since the injunctive relief that the plaintiff is seeking is prospective in nature, the

plaintiff's ADA claims for injunctive relief against the defendants in their official capacities are not

barred by the Eleventh Amendment. *See Miller v. King, supra,* 384 F.3d at 1264 (holding that the

Eleventh Amendment does not bar ADA suits under Title II for prospective injunctive relief against

state officials in their official capacities).[4]

---

[4]  We note that the Third Circuit in *Koslow v. Com. of Pa.*, 302 F. 3d 161, 178 (3d Cir.
2002), held that "federal ADA claims for prospective injunctive relief against state officials are
authorized by the *Ex parte Young* doctrine."  The *Koslow* Court concluded that Plaintiff could
bring an ADA claim against the state prison superintendent acting in his official capacity for
prospective injunctive relief. *Id.*  However, prospective relief under the ADA against state
officials in their individual capacities cannot proceed.  *Id.* at 178.

**VI.  Recommendations.**

Based on the foregoing, it is recommended that the defendants' Motion (Doc. 28) for Judgment on the Pleadings be granted in part and denied in part.  It is recommended that the plaintiff's claims against the defendants in their individual capacities under Title II of the ADA and under the Rehabilitation Act be dismissed,  and that the plaintiff's claims against the defendants in their official capacities for damages under Title II of the ADA be dismissed.  In all other regards, it is recommended that the motion be denied.


**s/ Thomas M. Blewitt**
**Thomas M. Blewitt**
**Magistrate Judge**

**Dated: December 30 2005**

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MINDY JAYE ZIED-CAMPBELL,          :        CIVIL NO: 1:CV-04-00026
        Plaintiff          :
                         :        (Judge Kane)
        v.          :
                         :        (Magistrate Judge Blewitt)
ESTELLE RICHMAN, Secretary          :
Pennsylvania Dept. of Public          :
Welfare; FREDERICK LANDAU,          :
Director the York County          :
Assistance Office; DOES 1-25;          :
and STEPHANIE LUDWIG, Supervisor          :
York County Assistance Office,          :
        Defendants          :

## NOTICE

      **NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **December 30, 2005.**

      Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings,
> recommendations or report addressing a motion or matter described in
> 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
> disposition of a prisoner case or a habeas corpus petition within ten (10)
> days after being served with a copy thereof.  Such party shall file
> with the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify the
> portions of the proposed findings, recommendations or report to which
> objection is made and the basis for such objections.  The briefing
> requirements set forth in Local Rule 72.2 shall apply.  A judge shall

make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis
of that record.  The judge may also receive further evidence, recall
witnesses or recommit the matter to the magistrate judge with
instructions.


                                                         **s/ Thomas M. Blewitt**
                                                          **THOMAS M. BLEWITT**
                                                          **United States Magistrate Judge**


**Dated: December 30, 2005**