**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MINDY JAYE ZIED-CAMPBELL,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION 1:04-CV-0026** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **ESTELLE RICHMAN, Secretary** | : | |
| **Pennsylvania Department of Public** | : | |
| **Welfare; FREDERICK LANDAU,** | : | |
| **Director of York County Assistance** | : | |
| **Office; DOES 1-25; and STEPHANIE** | : | |
| **LUDWIG, Supervisor of York County** | : | |
| **Assistance Office,** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM</u>**

Before the Court are Magistrate Judge Thomas M. Blewitt's Report and

Recommendation (Doc. No. 67), Plaintiff's objections thereto (Doc. No. 72), Defendants'

response (Doc. No. 76), and Plaintiff's reply (Doc No. 80).  For the reasons discussed below, the

Court will adopt Magistrate Judge Blewitt's Report and Recommendation and grant in part and

deny in part Defendants' Motion for Judgment on the Pleadings.  (Doc. No. 28.)

1.    **BACKGROUND**[1]

Plaintiff has a permanent psychological disability that limits her ability to perform major

life activities.  (Doc. No. 26, ¶¶ 11-12.)  In September 2001, Plaintiff applied for and was

granted supplemental security income benefits from the Social Security Administration.  (Id. ¶

13.)  Plaintiff subsequently applied to the York County Assistance Office for cash aid, food

stamps, and Medicaid.  (Id. ¶ 14.)  Plaintiff claims that over the next two years, individuals at the

---

[1]  The factual background of this case is detailed more fully in Magistrate Judge Blewitt's
Report and Recommendation.  The Court accepts all factual allegations as true.

Pennsylvania Department of Public Welfare and the York County Assistance Office

discriminated against her because of her disability.[2]  Specifically, Plaintiff asserts that she is a

qualified person with a disability, and that Defendants violated Title II of the ADA when, by

reason of her disability, they: (1) created unnecessary eligibility standards and rules that have

denied her access to and the enjoyment of the services and programs offered; (2) refused

Plaintiff's reasonable requests for accommodation of her disability; (3) violated regulations

ensuring that communications with members of the public with disabilities are as effective as

communications with others; and (4) retaliated against Plaintiff because she asserted her rights

and complained about the manner in which she had been treated.  (Id. ¶¶ 56-64.)

    Plaintiff initiated this civil action through a pro se complaint filed on January 7, 2004.

(Doc. No. 1.)  With the assistance of counsel, Plaintiff filed an amended complaint on September

13, 2004.  (Doc. No. 26.)  Plaintiff's amended complaint seeks injunctive relief and damages

under Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 et seq. ("Title II

of the ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) ("Section

504 of the RA").  (Id.)  The amended complaint contains three counts against the named

Defendants:  a claim under Section 504 of the RA (Count I); a claim under Title II of the ADA

(Count II); and claims of retaliation under both the RA and the ADA (Count III).  On September

22, 2004, Defendants collectively filed an answer to the amended complaint.  (Doc. No. 27.)  On

November 19, 2004, Defendants filed a Motion for Judgment on the Pleadings pursuant to Rule

---

    [2] Plaintiff's amended complaint names the following Defendants:  Estelle Richman, the
Secretary of the Pennsylvania Department of Public Welfare; Frederick Landau, the Director of
the York County Assistance Office; Stephanie Ludwig, a Supervisor for the York County
Assistance Office; and Does 1 through 25, identified as employees of the York County
Assistance Office.  (Id.)  All are named in their official and individual capacities.

12(c) of the Federal Rules of Civil Procedure.  (Doc. No. 28.)

On December 12, 2005, Magistrate Judge Blewitt issued a Report and Recommendation addressing Defendants' motion, wherein Judge Blewitt recommended that Defendants' motion be granted in part and denied in part.  (Doc. No. 67.)  In his Report and Recommendation, Magistrate Judge Blewitt concluded the following:  (1) Defendants are not liable as individuals under either Section 504 of the RA or Title II of the ADA; (2) Defendants in their official capacities are immune from suit for damages under Title II of the ADA pursuant to Eleventh Amendment sovereign immunity; and (3) Defendants are not liable for retaliation under Section 504 of the RA.  (Id.)  In all other respects, Magistrate Judge Blewitt recommended denying Defendants' motion.  (Id.)  On January 17, 2006, Plaintiff filed objections to the Report and Recommendation, arguing that the Magistrate Judge erred in finding that Defendants in their official capacities are immune from suit for damages under Title II of the ADA.[3]  (Doc. Nos. 72, 73.)  On January 31, 2006, Defendants filed a response to Plaintiff's objections.  (Doc. No. 76.)  On February 15, 2006, Plaintiff filed a reply brief.  (Doc. No. 80.)

## II.   STANDARD OF REVIEW

When objections to a report and recommendation have been filed, the Court must make a de novo consideration of those portions of the report to which the objections relate.  Carter v. Apfel, 220 F. Supp. 2d 393, 395 (M.D. Pa. 2000) (citing Samples v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989)).  In so doing, the Court may accept, reject, or modify the findings and recommendations contained in the report.  28 U.S.C. § 636(b)(1); Local Rule 72.1.  Further, in

---

[3]  The parties did not present any arguments in opposition to Magistrate Judge Blewitt's recommendations concerning individual liability under the ADA and RA, or Plaintiff's claims for injunctive relief against Defendants in their official capacities.  (Doc. No. 67, §§ III and V.)

the exercise of sound judicial discretion, the Court may rely on the magistrate judge's proposed findings and recommendations.  United States v. Raddatz, 447 U.S. 667, 676 (1980); Govey v. Clark, 749 F.2d 5, 7 (3d Cir. 1984) ("[t]he Supreme Court has recognized the discretion afforded federal district courts in their use of magistrate's reports").

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is treated using the same standard as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and it can be brought by any party after the pleadings are closed.  Regalbuto v. City of Philadelphia, 937 F. Supp. 374, 376-77 (E.D. Pa. 1995).  In deciding a rule 12(c) motion, the Court must view all facts and draw all inferences from the pleadings in the light most favorable to the non-moving party.  Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399, 406 (3d Cir. 1993) (citation omitted).  The Court may not grant judgment on the pleadings unless the movant clearly establishes that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law.  Travelers Indemnity Co. v. Stedman, 895 F. Supp. 742, 745-46 (E.D. Pa. 1995).

## III.    DISCUSSION

In Count II of the amended complaint, Plaintiff claims that Defendants violated Title II of the ADA by failing to modify their practices, procedures, and policies to accommodate Plaintiff's disability.  (Doc. No. 26, ¶ 80.)  In their motion for judgment on the pleadings, Defendants argue that the Eleventh Amendment to the United States Constitution bars Plaintiff's claims against them in their official capacities for damages under Title II of the ADA.  (Doc. No. 29, at 6.)  Magistrate Judge Blewitt agreed and recommended dismissal of this claim.  Plaintiff objected, arguing that Congress abrogated state sovereign immunity under Title II of the ADA

4

and, therefore, that Defendants can be held liable in their official capacities for damages under Title II of the ADA.  (Doc. No. 73.)[4]

    **A.    *Framework for analyzing Title II claims in the context of state sovereign immunity***

Congress enacted the Americans with Disabilities Act "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  The statute prohibits discrimination against individuals with disabilities in the areas of employment (Title I), public services, programs, and activities (Title II), and public accommodations (Title III).  Tennessee v. Lane, 541 U.S. 509, 516-17 (2004).

In the instant action, Plaintiff seeks relief under Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Act defines a qualified individual with a disability as one "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Id. § 12131(2).  Thus, the act imposes a duty of reasonable

---

[4]  The parties also briefed the issue of whether Defendants (and specifically Defendant Richman in her official capacity as Secretary of the Pennsylvania Department of Welfare) are liable in their official capacities under Section 504 of the RA.  (Doc. Nos. 73, 76, 80.)  However, this issue was neither argued in Defendants' Motion for Judgment on the Pleadings nor addressed by Magistrate Judge Blewitt in his Report and Recommendations.  Accordingly, the Court declines to address this issue at this time.

accommodation on all public entities.

Title II also authorizes private citizens to bring suits for money damages against public entities for violations of this provision.  Id. § 12133 (incorporating by reference 29 U.S.C. § 749).  Additionally, and of particular relevance to this action, Title II purports to abrogate state sovereign immunity, providing that a "State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202.

While the text of the Eleventh Amendment[5] appears to restrict only Article III diversity jurisdiction of the federal courts, Supreme Court jurisprudence makes clear that the amendment "stand[s] not so much for what it says, but for the presupposition . . . which it confirms." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996) (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)).  This presupposition has two parts: "first, that each State is a sovereign entity in our federal system; and second, that [i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent."  Id. (internal citations and quotations omitted).  Because of the broad principle of sovereign immunity in our federal system, federal courts have jurisdiction over suits against a state by an individual if, and only if, (1) the State has explicitly consented to the suit, or (2) Congress has unequivocally abrogated sovereign immunity acting pursuant to a valid grant of constitutional

---

[5]  The Eleventh Amendment provides:

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of Any Foreign State.

authority.  Kimel v. Florida Bd. of Regents, 528 U.S. 62, 73 (2000).

The Commonwealth of Pennsylvania has not consented to suit in federal court under these circumstances, see 42 Pa. Cons. Stat. §§ 8521(b), 8522 (announcing the Commonwealth's retention of sovereign immunity and listing the narrow areas in which the Commonwealth has consented to suit), so the Court must analyze whether Congress has clearly expressed its intent to abrogate state sovereign immunity and whether it has the power to do so.  In the ADA, Congress clearly expressed its intent to abrogate the States' Eleventh Amendment immunity.  42 U.S.C. § 12202 ("A State shall not be immune under the eleventh amendment to the Constitution of the United States for an action in Federal or State court of competent jurisdiction for a violation of this Act").  Therefore, the Court must determine whether, under the circumstances of the instant case, Congress acted pursuant to a valid grant of constitutional authority when it purported to abrogate state sovereign immunity under Title II of the ADA.

**B.      *The Fourteenth Amendment as a means for Congress to abrogate state sovereign immunity***

Congress enacted the Americans with Disabilities Act ("ADA") pursuant to its Article I commerce power and its enforcement power under § 5 of the Fourteenth Amendment.  42 U.S.C. § 12201(b)(4).  Because Congress may not abrogate state sovereign immunity under the Commerce Clause of Article I, Kimel, 528 U.S. at 78-79, the question becomes whether the ADA and its purported abrogation of state sovereign immunity is a valid exercise of Congress's remedial powers under § 5 of the Fourteenth Amendment.  See, e.g., Tennessee v. Lane, 541 U.S. 509, 518 (2004) (citing Fitzpatrick v. Bitzer, 427 U.S. 445 (1976)) (Congress has the authority to "abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment to enforce the substantive guarantees of

that Amendment.").

Two provisions of the Fourteenth Amendment are relevant to the Court's discussion.

Section 1 of the Fourteenth Amendment provides, in relevant part:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of laws.

Section 5 of the Fourteenth Amendment "grants Congress the power to enforce the substantive guarantees contained in § 1 by enacting 'appropriate legislation,'" Bd. of Trustees of the Univ. of Ala. v. Garrett, 531 U.S. 356, 365 (2001), which "includes the power to abrogate state sovereign immunity," United States v. Georgia, 126 S. Ct. 877, 882 (2006).

The Supreme Court has emphasized that the grant of authority in § 5 does not limit Congress to "mere legislative repetition of [the] Court's constitutional jurisprudence." Garrett, 531 U.S. at 365. Instead, Congress has the power "both to remedy and to deter violation of rights guaranteed [under the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Id. Stated differently, "Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct in order to prevent and deter unconstitutional conduct." Nevada v. Hibbs, 538 U.S. 721, 727-28 (2003).

Supreme Court jurisprudence, however, cautions that courts must be cognizant of the distinction between "measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law." City of Boerne v. Flores, 521 U.S. 507, 519 (1997); see also Hibbs, 538 U.S. at 728 (both cases emphasizing that it is the responsibility of the

Court, not Congress, to define the contours of substantive constitutional rights).  With respect to § 5 legislation that reaches beyond the scope of § 1's actual guarantees, the Court requires that lower courts determine whether the legislation exhibits a sufficient relationship – a congruence and proportionality – between the injury Congress sought to prevent or remedy and the means adopted to that end.  Garrett, 531 U.S. at 356; City of Boerne, 521 U.S. at 520.  The roadmap for making this determination was laid out by the Court in City of Boerne v. Flores and its progeny.

### 1.        The Court's three-part analysis from City of Boerne v. Flores

In City of Boerne v. Flores, the Supreme Court articulated a three-part test to determine whether Congress has acted within the scope of its § 5 power to abrogate States' Eleventh Amendment immunity.  521 U.S. 507, 520 (1997).  The initial step in a City of Boerne analysis is to "identify with some precision the scope of the constitutional right at issue."  Garrett, 531 U.S. at 365.  Next, the court must examine whether Congress identified a history and pattern of unconstitutional discrimination by the States against the disabled.  Id. at 367.  Finally, if there is a pattern of unconstitutional conduct on the part of the State, the court must analyze whether the statute is an appropriate, congruent, and proportional response to the history and pattern of the targeted unconstitutional treatment.  Id. at 374.

### 2.        United States v. Georgia and the City of Boerne test

In her objections to Magistrate Judge Blewitt's report and recommendation, Plaintiff argues that the recent Supreme Court decision of United States v. Georgia, 126 S. Ct. 877 (2006), should alter the outcome of this Court's sovereign immunity analysis.  Because of Georgia's significance in analyzing claims of abrogation under Title II, the Court must set forth Georgia's relationship to the traditional three-prong City of Boerne analysis.

In <u>Georgia</u>, the Supreme Court considered whether a paralyzed inmate in a state prison could sue the State for money damages under Title II.  <u>Id.</u> at 878.  The disabled inmate, Tony Goodman, filed a <u>pro se</u> Title II complaint containing numerous allegations, "both grave and trivial," regarding the conditions of his confinement in the Georgia prison system.  <u>Id.</u> at 879. The district court granted summary judgment to the state defendants on Goodman's Title II claims, holding that the claims were barred by state sovereign immunity.  <u>Id.</u> at 880.  The Eleventh Circuit upheld this ruling, but remanded the suit to the district court to allow Goodman to amend his complaint to reassert some of his § 1983 claims previously dismissed as vague.  <u>Id.</u> In its ruling, the Eleventh Circuit held that Goodman had alleged actual violations of the Eighth Amendment.  <u>Id.</u> at 880, 881 (the Supreme Court likewise noted that some of the alleged conduct independently violated § 1 of the Fourteenth Amendment).  The Supreme Court granted certiorari to consider whether, with respect to Goodman's Title II claims, Congress had validly abrogated sovereign immunity.  <u>Id.</u> at 880.

In answering this question, a unanimous Supreme Court held that Title II abrogates state sovereign immunity "insofar as Title II creates a private cause of action for damages against the state for conduct that <u>actually</u> violates the Fourteenth Amendment."  <u>Id.</u> at 882 (emphasis in original).  Thus, where the conduct complained of by a plaintiff independently violates the Fourteenth Amendment, Congress has abrogated state sovereign immunity.  However, to the extent that a state's alleged misconduct violates Title II but does not violate the Fourteenth Amendment, the Supreme Court held that courts must determine "whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid," <u>id.</u>, through an application of the <u>City of Boerne</u> analysis.  In this case, Plaintiff has not alleged any actual

violations of the Fourteenth Amendment; rather, she brings her claims under the broader scope of Title II.  Therefore, as <u>Geogia</u> instructs, the Court proceeds with its analysis under <u>City of Boerne</u>.

> ### C.      Application of <u>*City of Boerne*</u> *and its progeny to Plaintiff's Title II claim*

Plaintiff and Defendants agree that <u>City of Boerne</u> sets forth the appropriate standard for determining whether, under the circumstances presented here, Congress acted within its § 5 power to enforce the Fourteenth Amendment when it purported to abrogate sovereign immunity under Title II of the ADA.  As evidenced by their objections to Magistrate Judge Blewitt's report and recommendation, Plaintiff and Defendants diverge, however, in their application and conclusions of steps two and three of the <u>City of Boerne</u> analysis.  Each step is addressed below.

### 1.  Step one: Identification of the rights at issue

The first step of a <u>City of Boerne</u> analysis requires that the Court "identify with some precision the scope of the constitutional right at issue." <u>Garrett</u>, 531 U.S. at 365.  The Supreme Court has recognized that Title II of the ADA covers a wide range of constitutional guarantees. <u>Lane</u>, 541 U.S. at 522-23, 528.  Among those guarantees protected by Title II, Magistrate Judge Blewitt found that Plaintiff's claims implicate the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment.  (Doc. No. 67, at 22.)

One of Title II's purposes is to enforce the Fourteenth Amendment's command that "all persons similarly situated should be treated alike." <u>Lane</u>, 541 U.S. at 522 (quoting <u>Cleburne v. Cleburne Living Ctr., Inc.</u>, 427 U.S. 432, 439 (1985).  Magistrate Judge Blewitt noted that, under the Supreme Court's equal protection jurisprudence, disability is not a suspect classification, and therefore, state action affecting the disabled is subject only to rational basis review. <u>Garrett</u>, 531

U.S. at 366; (Doc. No. 67, at 22) (referring to <u>Cleburne</u>, 473 U.S. 432).  Classifications based on disability violate the Fourteenth Amendment only if they lack a legitimate relationship to a governmental purpose.  <u>Garrett</u>, 531 at 366-67.  As long as states' actions toward disabled individuals are rational, states do not run afoul of the Equal Protection Clause by failing to make special accommodations for the disabled.  <u>Id.</u> at 367-68.  Title II touches upon equal protection by calling for reasonable accommodations for the disabled.

Beyond the prohibition on irrational discrimination, Title II also implicates certain rights protected by the Due Process Clause of the Fourteenth Amendment.  <u>Lane</u>, 541 U.S. at 523. Addressing Plaintiff's due process argument, Magistrate Judge Blewitt explained that a protected property interest arises only after a determination that an individual is entitled to receive benefits.  (Doc. No. 67, at 23.)  Accordingly, an individual has no interest protected by the Due Process Clause merely in applying for welfare benefits.  <u>See</u> <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 317 (M.D. Pa. 2004) (eligibility for a benefit means that the person has an ability to seek the benefit, whereas entitlement to a benefit means the person may control the benefit).

Moreover, Magistrate Judge Blewitt noted that "[w]elfare benefits are not a fundamental right, and neither the State nor Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support."  <u>Lavine v. Milne</u>, 424 U.S. 577, 585 n.9 (1976); (Doc. No. 67, at 23) (citing to <u>Lavine</u> for this proposition).

Magistrate Judge Blewitt concluded that the first part of the <u>City of Boerne</u> analysis was satisfied because Plaintiff's claims implicated both equal protection and due process.  (Doc. No. 67, at 22-23 & n.3.)  Neither party disputes Magistrate Judge Blewitt's findings as to this first part of the analysis.

### 2.      Step two: Determination of whether Congress identified a history and pattern of unconstitutional conduct by the States

Having identified the scope of the protected rights implicated by Plaintiff's Title II claim, the next step under <u>City of Boerne</u> is to determine whether Congress identified a history and pattern of unconstitutional conduct by the states. <u>Garrett</u>, 531 U.S. at 374. Magistrate Judge Blewitt acknowledged, and this Court agrees, that Plaintiff failed to "point[] to evidence of a pattern of discrimination or denial of due process specifically in connection with the receipt of welfare benefits by the disabled." (Doc. No. 67, at 24.) Magistrate Judge Blewitt went on to cite <u>Lane</u> for the proposition that Title II in its entirety satisfies the second step in the <u>City of Boerne</u> test. (Doc. No. 67, at 27); <u>see</u> <u>Lane</u>, 541 U.S. at 529.

In <u>Lane</u>, the Supreme Court concluded that the extensive record of disability underlying Congress's stated findings for enacting the ADA "makes clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation." 541 U.S. at 529. The <u>Lane</u> Court's extensive discussion of this pattern and history of disability discrimination spans several pages of the majority's opinion and details discrimination in a variety of settings, including zoning, education, transportation, communication, recreation, health services, voting, and access to public services. <u>Id.</u> at 524-29. Importantly, the Supreme Court did not limit its inquiry at this stage to the specific right at issue, namely access to the courts; rather, the Court considered Title II in the broader sense of disability discrimination in the administration of public services generally, determining that Title II in its entirety satisfies the second step of <u>City of Boerne</u>'s analysis. <u>See</u> <u>id.</u> at 529.

Defendants contend that this reading of <u>Lane</u> is legally inaccurate and that <u>Lane</u> does not hold that Title II always passes the second step of <u>City of Boerne</u>. They argue that the inquiry at

this stage should be specific to Plaintiff's claims and not take a broader view of Title II.  In

essence, Defendants argue that the second prong cannot be satisfied because "there is no

indication that Congress enacted Title II based upon evidence of any widespread pattern of

discrimination or deprivation of fundamental constitutional rights within state welfare systems."

(Doc. No. 29, at 13.)

Defendants' contention that a narrower, more focused inquiry is appropriate at the second

stage of the City of Boerne analysis is not without support.  See, e.g., Toledo v. Sánchez, 454

F.3d 24, 35 (1st Cir. 2006) (focusing the entire City of Boerne test on the area of public

education.  Circuit courts that have addressed this argument have reached varying conclusions

as to the proper scope for the second prong of the City of Boerne inquiry.  Compare Toledo, 454

F.3d at 35 (concluding that "the sounder approach is to focus the entire City of Boerne test on

the particular category of state conduct at issue"), with Klinger v. Missouri, 455 F.3d 888, 896

(8th Cir. 2006) (explaining that Lane has conclusively established that Title II survives the first

two steps of the City of Boerne inquiry when a claim sounding in equal protection is raised);

Constantine v. The Rectors and Visitors of George Mason University, 411 F.3d 474, 487 (4th

Cir. 2005) ("After Lane it is settled that Title II was enacted in response to a pattern of

unconstitutional disability discrimination by the States and nonstate governmental entities with

respect to the provision of public services"); and Ass'n for Disabled Americans, Inc. v. Florida

Intern. Univ., 405 F.3d 954, 598 (11th Cir. 2005) ("[T]he Supreme Court [in Lane] ruled that the

second Boerne inquiry was satisfied.").

At the time the parties briefed the objections to the report and recommendation, there

were no precedential Third Circuit decisions addressing whether the Court's decision in Lane

foreclosed further inquiry into whether Title II meets the second prong of <u>City of Boerne</u>.[6]  In February 2007, however, the Third Circuit decided <u>Bowers v. National Collegiate Athletic Association</u>, 475 F.3d 524 (3d Cir. 2007).  In that case, the circuit court was presented with the question "whether Congress exceeded its authority under § 5 of the Fourteenth Amendment in purporting to abrogate state sovereign immunity under Title II of the ADA with respect to public education."  <u>Bowers</u>, 475 F.3d at 550.  At the second step of <u>City of Boerne</u>, the Third Circuit simply stated: "The Court in <u>Lane</u> concluded that Congress had clearly identified a history and pattern of disability discrimination with respect to public services."  <u>Id.</u> at 554.  The Third Circuit explained in a footnote that, in reaching this conclusion, the <u>Lane</u> Court "considered evidence of disability discrimination in a variety of public services, not just limited to access  to the courts."  <u>Id.</u> at 554 n.35 (citing <u>Lane</u>, 515 U.S. at 523-26).  The Third Circuit also acknowledged that, in <u>Cochran v. Pinchak</u>, 401 F.3d 184 (3d Cir. 2005), it had "recognized that the second prong of the <u>Boerne</u> test was conclusively established with respect to Title II by the <u>Lane</u> Court."[7]  <u>Bowers</u>, 475 F.3d at 554 n.35 (citing <u>Cochran</u>, 401 F.3d at 191).

---

[6]  The sole Third Circuit opinion to have mentioned this issue, <u>Cochran v. Pinchak</u>, 401 F.3d 184 (3d Cir. 2005), was vacated pending the Supreme Court's decisions in <u>United States v. Georgia</u> and <u>Goodman v. Georgia</u>.  <u>Cochran</u>, 412 F.3d 500.  <u>Cochran</u> does, however, support the conclusions reached by both Magistrate Judge Blewitt and this Court that (1) Title II is to be considered in its entirety and (2) the Supreme Court decision in <u>Lane</u> compels the conclusion that Title II meets the second step of the <u>City of Boerne</u> analysis.  Both the majority and dissenting judge in <u>Cochran</u> were of the "view that Title II in its entirety satisfies <u>Boerne</u>'s step-two requirement."  <u>Cochran</u>, 401 F.3d at 191 & n.3 (concluding that <u>Lane</u> stands for the proposition that Title II in its entirety satisfies <u>City of Boerne</u>'s step-two requirement); <u>id.</u> at 195 (Scirica, C.J., dissenting) (taking "account of the large body of evidence the Court identified in <u>Lane</u> that satisfied step two of the <u>Boerne</u> analysis").

[7]  In the same footnote the Third Circuit made this statement, it also noted that other courts, specifically the First Circuit, have focused the entire <u>City of Boerne</u> inquiry on the particular conduct at issue.  <u>Bowers</u>, 475 F.3d at 554 n.35 (citing <u>Toledo</u>, 454 F.3d at 35).  The circuit court then commented upon the "long and sad history of discrimination against students

Accordingly, this Court's inquiry is not confined, as Defendants urge, to discerning a pattern and history of discrimination in the receipt of welfare benefits; rather, the second step of the analysis set forth in City of Boerne requires a consideration of Title II in a broader sense. Because the Supreme Court in Lane has already made the determination that Title II is appropriate prophylactic legislation in response to a history and pattern of discrimination, see Lane, 541 U.S. at 529, Defendants' objection to this portion of Magistrate Judge Blewitt's report and recommendation is overruled.

> **3.  Step three: Determine whether the statute is an appropriate, congruent, and proportional response to the history and pattern of unconstitutional treatment**

The third and final step in the City of Boerne test requires courts to determine whether the statute is an appropriate, congruent, and proportional response to the history and pattern of unconstitutional treatment.  Garrett, 531 U.S. at 374.  "The appropriateness of remedial measures must be considered in light of the evil presented.  Strong measures appropriate to address one harm may be an unwarranted response to another, lesser one."  City of Boerne, 521 U.S. at 530 (internal citation omitted).  To survive scrutiny, Title II must be tailored to remedy or prevent the "identified conduct transgressing the Fourteenth Amendment's substantive provisions."  Coll. Sav. Bank v. Florida Prepaid Postsecondary Edu. Expense Bd., 527 U.S. 627, 639 (1999).

Unlike the second step, with its more general inquiry, at the third stage of the City of Boerne analysis, the Court must consider discrimination in the specific context of Plaintiff's claims and then evaluate Congress's response to determine if it was appropriately tailored to the

---

with learning disabilities prior to the adoption of Title II of the ADA."  Id.  Notwithstanding the Third Circuit's discussion of disability discrimination in the context of public education – the specific issue in Bowers – the Court does not understand this dictum to call for a narrow, as-applied inquiry at the second step of the City of Boerne inquiry.

identified conduct.  See Lane, 541 U.S. at 530-31 (indicating that an as-applied analysis is required at the third step of the analysis).  Plaintiff urges that this step is satisfied because Lane detailed a history of discrimination in state services, because welfare is a state service, and because Title II was found in Lane to be appropriate prophylactic legislation in response to discrimination against the disabled.  (Doc. No. 72, at 3, 11.)  This generalized level of inquiry, however, is inappropriate at the third step of the City of Boerne analysis.  See Lane, 541 U.S. at 530, 531 & n.18 (noting that "nothing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole" and focusing its step-three analysis specifically on access to judicial services); see also Bowers, 475 F.3d at 555-56 (focusing the third step of the analysis on education).

Like Magistrate Judge Blewitt, this Court concludes that the proper inquiry at this stage in the City of Boerne analysis must focus on discrimination in the context of state welfare systems and the receipt of welfare benefits.  This inquiry speaks directly to the right to be free from irrational disability discrimination in the welfare context and to Plaintiff's allegations of due process violations in connection with her application for and receipt of benefits.  The Supreme Court's discussion of irrational discrimination in Lane did not address the extent or severity of disability discrimination in this particular context.  Lane, 541 U.S. at 524-25 (identifying several general areas in which there has been a demonstrated history of irrational discrimination by States against the disabled: voting, marriage, jury eligibility, state mental institutions, zoning decisions, public education, the penal system, and access to the judicial system and public services).

In order to consider the appropriateness, proportionality, and congruence of legislation

under <u>City of Boerne</u>, the Court must first consider how grave and how widespread the specific

discriminatory practices at issue are.  To this effect, the Court notes that Plaintiff has offered no

evidence that Congress considered discrimination in state welfare systems to be a pervasive

problem warranting broad prophylactic measures, or that Congress enacted Title II in response to

any pattern of irrational disability discrimination by state welfare systems.  <u>Compare with</u>

<u>Bowers</u>, 475 F.3d at 554 n.35, 555 (specifically noting the severe problem of disability

discrimination in the context of public education that existed prior to the adoption of Title II of

the ADA).  This Court's independent review of the legislative history of the ADA likewise failed

to reveal a history or pattern of discrimination against the disabled in the welfare context.[8]  <u>See,</u>

<u>e.g.</u>, H.R. REP. 101-485(I)-(IV).  Thus, this case is unlike <u>Lane</u>, where both Congress and the

---

[8]  While this Court does not consider the absence of this congressional finding fatal to
Plaintiff's argument that <u>City of Boerne</u>'s third prong was met, it undercuts Plaintiff's assertion
that disability discrimination in state welfare services is a severe problem requiring the broad
remedial measures of Title II.  The Court notes that Plaintiff has not offered any evidence –
whether contained in the legislative history of the ADA or elsewhere – of a widespread or severe
problem of disability discrimination in state welfare systems.  This absence of evidence about
irrational disability discrimination differs markedly from the showing that was made in <u>Bowers</u>,
wherein the Third Circuit determined that, as applied to public education, Title II of the ADA
abrogated state sovereign immunity.  In that case, the court was presented ample evidence of the
severity of the problem at issue:

> As pointed out correctly by the United States in its brief, our national
> history in educating students with disabilities leaves much to be
> desired.  In many past instances, States have made educational
> decisions on the basis of irrational misconceptions and stereotypes
> held about disabled students.  <u>See</u> Gov't's Br. at 27-32 (documenting
> various instances of exclusion and segregation of disabled students).
> Given this regrettable past history, Title II is a justifiable prophylactic
> measure to avoid the risk of unconstitutional treatment of disabled
> students.

<u>Id.</u> at 555; <u>see also</u> <u>id.</u> at 554 n.35, 556.  Given the widespread pattern of states' unconstitutional
treatment of the disabled in the public education system, the Third Circuit joined several other
circuit courts in holding that Title II is a congruent and proportional remedy to discrimination in
the context of public education.  <u>Id.</u> at 555-56.

Court recognized the extent of disability discrimination in the context of access to the courts and judicial services and the severity of the harm caused by the discrimination.  See Lane, 541 U.S. at 529-31.

Moreover, unlike Lane, the case at bar does not implicate a fundamental constitutional right.  See Lavine v. Milne, 424 U.S. 577, 585 n.9 (1976) ("Welfare benefits are not a fundamental right, and neither the State nor Federal Government is under any sort of constitutional obligation to guarantee minimum levels of support.").  A state's due process obligation to provide meaningful access to the courts, addressed in Lane, is distinguishable from the wide latitude a state enjoys in equal protection cases not involving a suspect classification or a fundamental right.  See Garrett, 531 U.S. at 367 (under rational basis, the burden is on the Plaintiff to show that there is no conceivable set of facts that could provide a rational basis for the state's actions).

Against this background, the Court must consider the congressional response to the alleged problem of discrimination in state welfare systems.  Through Title II, Congress imposes an affirmative duty on the States to accommodate disabled individuals seeking welfare benefits at all stages of their benefits request.  See 42 U.S.C. § 12131(2).  The Equal Protection Clause demands much less, as "States are not required . . . to make special accommodation for the disabled, so long as their actions toward such individuals are rational."  Garrett, 531 U.S. at 367. Additionally, since no interest protected by the Due Process Clause arises until there is an entitlement to benefits, the duty to accommodate in Title II also exceeds what is required by the Due Process Clause of the Fourteenth Amendment.  (See Doc. No. 67, at 26) (Magistrate Judge Blewitt noted that the duty to accommodate under Title II applies to all stages and aspects of an

individual's interaction with the state welfare system, including the mere application or request for benefits, not just interaction with the system after an entitlement has arisen). Thus, the requirements of the States under Title II of the ADA in the welfare context exceed what is required by either the Equal Protection or Due Process Clauses of the Fourteenth Amendment.

In light of the circumscribed nature of the rights Plaintiff seeks to protect, the absence of congressional findings of irrational disability discrimination in the context of state welfare systems, and Plaintiff's failure to introduce evidence of a grave or widespread problem of disability discrimination by the state welfare systems, the Court concludes that the remedies connected to Title II, to the extent that it regulates Pennsylvania's duty to accommodate disabled individuals in the context of the state welfare system and receipt of welfare benefits, are not congruent and proportional to the targeted constitutional infirmity so as to abrogate the sovereign immunity of the Commonwealth. The Court agrees with Magistrate Judge Blewitt's conclusion that Title II of the ADA, as applied in this case, does not satisfy step three of <u>City of Boerne</u>, and therefore does not validly abrogate the Eleventh Amendment immunity of the states.

As described above, the outcome of the Court's analysis is not altered by the Supreme Court's decision of <u>United States v. Georgia</u>, 126 S. Ct. 877 (2006).[9] Plaintiff does not contend

---

[9] Plaintiff argues that the <u>Georgia</u> stands for the proposition that Congress has the power to abrogate Eleventh Amendment immunity under Title II of the ADA when applied to a disabled citizen seeking state services in the form of public welfare benefits. (Doc. No. 73, at 10.) Plaintiff's reliance on the Supreme Court's holding in <u>Georgia</u> is misplaced. In <u>Georgia</u>, the Supreme Court found that § 5 of the Fourteenth Amendment grants Congress the power to create private remedies against States for <u>actual</u> violations of that amendment. <u>Georgia</u>, 126 S. Ct. at 881. Thus, "insofar as Title II [of the ADA] creates a private cause of action for damages against the States for conduct that <u>actually</u> violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." <u>Id.</u> at 882 (emphasis in original). The Supreme Court remanded the case to the lower courts to determine whether Congress had properly abrogated sovereign immunity for conduct asserted by the claimant that would violate Title II without violating the Fourteenth Amendment, which is the issue in the case <u>sub judice</u>. <u>Id.</u> To the extent

that Defendants' conduct actually violated the Equal Protection and Due Process Clauses of the Fourteenth Amendment; rather, Plaintiff claims that Defendants' alleged discrimination and failure to accommodate Plaintiff's disability violated the more expansive ADA. Consistent with the requirements of Georgia, this Court has concluded that Title II has not abrogated state sovereign immunity in the context of state welfare systems because it fails the third prong of the City of Boerne analysis. Plaintiff's objections based on Georgia are overruled.

## IV.   CONCLUSION

The parties have objected to Magistrate Judge Blewitt's report and recommendation insofar as he applies the City of Boerne analysis to Plaintiff's Title II claim for damages against Defendants in their official capacities. The Court agrees with Magistrate Judge Blewitt's conclusions that (1) Title II implicates a variety of constitutional guarantees; (2) Title II, considered in its entirety, is prophylactic legislation enacted in response to a history and pattern of unconstitutional discrimination against the disabled; and (3) the remedies connected to Title II, to the extent that it regulates Pennsylvania's duty to accommodate disabled individuals in the context of its welfare system and receipt of benefits, are not congruent and proportional to the targeted constitutional infirmity so as to abrogate the sovereign immunity of the Commonwealth. Accordingly, the Court will adopt Magistrate Judge Blewitt's report and recommendation and grant partial judgment on the pleadings for Defendants.

An appropriate order follows.

---

that a state's alleged misconduct violates Title II but does not independently violate the constitution, a court is to apply the three-step analysis articulated in City of Boerne to determine whether Congress permissibly abrogated sovereign immunity.   Id.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MINDY JAYE ZIED-CAMPBELL,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION 1:04-CV-0026** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **ESTELLE RICHMAN, Secretary** | : | |
| **Pennsylvania Department of Public** | : | |
| **Welfare; FREDERICK LANDAU,** | : | |
| **Director of York County Assistance** | : | |
| **Office; DOES 1-25; and STEPHANIE** | : | |
| **LUDWIG, Supervisor of York County** | : | |
| **Assistance Office,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

　　**AND NOW**, this 30th day of March, 2007, upon a <u>de novo</u> review of the record and applicable law, the Court **HEREBY ADOPTS** Magistrate Judge Blewitt's Report and Recommendation, and **OVERRULES** Plaintiff's objections to the same.  Defendants' Motion for Judgment on the Pleadings (Doc. No. 28) is **GRANTED** in part and **DENIED** in part as follows:

　　　　1.　　Plaintiff's claims against Defendants in their individual capacities under Title II of the Americans with Disabilities Act ("ADA") and under the Rehabilitation Act are **DISMISSED**;

　　　　2.　　Plaintiff's claims against Defendants in their official capacities for damages under Title II of the ADA are **DISMISSED**; and

　　　　3.　　In all other respects, Defendants' motion is **DENIED**.

This case is **REMANDED** to Magistrate Judge Blewitt for further proceedings.

s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
